UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTATE OF KEVIN MATTHEWS,

    Plaintiff,

v.

CITY OF DEARBORN and
CITY OF DEARBORN POLICE
OFFICER CHRIS HAMPTON,

    Defendants.
_____/

Case No. 16-13763

HON. GEORGE CARAM STEEH

OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DOC. 76)

Before the court is Defendant Chris Hampton's motion for summary judgment, which has been fully briefed. The court heard oral argument on April 22, 2019, and took the matter under advisement. For the reasons explained below, Defendant's motion is denied.

BACKGROUND FACTS

This case arises from a fatal police shooting. On December 23, 2015, Dearborn Police Officer Chris Hampton was in the midst of a traffic stop when he noticed Kevin Matthews walking by. Hampton knew that Matthews was wanted for trespass and larceny as a result of an incident that occurred hours

earlier at a gas station, when he was accused of trying to steal a can of Red Bull.  At the time, Matthews fled from officers.  Hampton had dealt with Matthews on prior occasions because of similar trouble at the gas station.  Matthews suffered from schizophrenia and bipolar disorder, with a history of threatening behavior, although it is not clear that Hampton was aware of this background. *See* Doc. 76-5, 76-6, 76-7.

As Matthews walked by Hampton, the officer decided to take Matthews into custody. *See* Doc. 76-13 (Hampton's report).  He concluded the unrelated traffic stop and drove his police vehicle in the direction that Matthews had travelled.  He caught up with Matthews and ordered him to stop.  As Matthews fled, Hampton exited his police car and ran after him.

After running about 130 yards, Matthews entered a backyard and climbed over a chain-link fence.  Hampton followed, jumping over the fence and landing on top of Matthews.  Hampton was the larger man at 6 foot 2 inches tall and 215 pounds; Matthews was about 5 foot 9 inches and 140 pounds. Matthews had fractured his left (dominant) arm four weeks before, on November 26, 2015, and had his soft cast removed on December 15, 2015.

Once on top of Matthews, Hampton informed police dispatch that he was "code green," meaning he believed he was safe.  Doc. 76-11; Doc. 76-12 at 89-91, 99-100.  According to Hampton, Matthews struggled free and was

able to grab Hampton's pepper spray from his duty belt and stand over him. Doc. 76-12 at 94-96. At this point, Hampton punched Matthews twice in the jaw, took the pepper spray, and threw it over the fence. *Id.* While they continued to struggle, Matthews stated the he was not going with Hampton and that he "didn't do anything." Doc. 76-13.

Matthews broke free and attempted to run; Hampton grabbed Matthews' sweater and pushed him into the garage door. According to Hampton, both men hit the garage door and fell to the pavement. While Hampton remained on his back, Matthews stood over him and grabbed his ammunition magazine. Doc. 76-12 at 129-31. Matthews then dropped the magazine and reached for Hampton's gun. *Id.* As Hampton described in his report, "I had my hand on my firearm for retention purposes, though Matthews' hand was also at the top of the gun/holster. I realized that my weapon was unholstered and Matthews was still grabbing the firearm. As we both struggled for control of my firearm, I was in fear that he would use it to harm and kill me to elude capture. As I was gaining control of my service weapon I fired at Matthews' body and shot him multiple times, stopping the threat." Doc. 76-13.

Although there were no eyewitnesses to the shooting, Angela Gray[1] saw the two men fighting from her window. Docs. 91-23, 91-24. After they moved out of her view, she heard a high-pitched voice scream "Get off me. Get off me." Doc. 91-24. She then heard gunshots. *Id.*

Hampton testified that his gun was in a double-lock holster, which requires two safety mechanisms to be released before the gun can be accessed. Doc. 76-12 at 138. Hampton stated that when Matthews "was going after" his gun, Hampton "grabbed it and realized it was free, it was loose" in his holster. *Id.* at 140. Hampton could not explain how his gun became loose, but stated that he did not release the safety mechanism. *Id.* at 138-47, 151-52. *See also* Doc. 91-20 (Plaintiff's expert, Roger Clark, discussing the safety mechanisms).

Hampton testified that he was "supine" on the ground and Matthews was leaning over him, about 12 to 13 inches away, when Hampton shot him in the chest. Doc. 76-12 at 153. Matthews was struck nine times. Hampton notified dispatch that shots were fired at 12:29 p.m., two minutes after he first approached Matthews on foot and one minute after he told dispatch he was "code green." Doc. 76-11. Matthews died from his injuries.

---

[1] Angela Gray is also referred to in the record as Angela Grayson.

LAW AND ANALYSIS

Brought pursuant to 42 U.S.C. § 1983, Plaintiff's complaint alleges claims under the Fourth and Fourteenth Amendments against Officer Hampton and the City of Dearborn. The parties stipulated to the dismissal of the Fourteenth Amendment equal protection claim and the claims against the City of Dearborn, leaving Plaintiff's excessive force claim under the Fourth Amendment. Plaintiff also "relies upon the substantive and procedural benefits of the Michigan Wrongful Death Act" in support of the estate's claim for damages. Doc. 19 at ¶ 85.

I. Standard of Review

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Dist. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). In response to a properly supported motion for summary judgment, the opposing party must come forward with specific evidence showing there is a genuine issue of fact for trial. A "mere scintilla" of evidence is insufficient to meet this burden; the evidence must be such that a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252.

When "the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Burnette v. Gee*, 137 Fed. Appx. 806, 809 (6th Cir. 2005) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)). In such cases, "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial." *Plakas*, 19 F.3d at 1147. *See also Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015) (courts must "carefully examine all evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts").

II. Qualified Immunity

Officer Hampton argues that he is entitled to qualified immunity, which "protects government officials from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In determining whether a government official is entitled to qualified immunity, the court inquires as follows: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-202. It is within the court's discretion to determine which prong of this analysis to address first, depending upon the circumstances of the case. *Pearson*, 555 U.S. at 236.

A. <u>Constitutional Violation</u>

The court will first consider whether Plaintiff has alleged sufficient facts demonstrating a constitutional violation. Plaintiff alleges that Officer Hampton's actions amounted to excessive force in violation of the Fourth Amendment. The Fourth Amendment guarantees individuals the right to be free from unreasonable seizures, including the use of excessive force. U.S. Const. Amend. IV; *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017). A standard of "objective reasonableness" governs whether an officer has used excessive force. *Thomas*, 854 F.3d at 365 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

In considering whether an officer has acted reasonably, the court analyzes the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

evade arrest by flight." *Id.* at 396. Deadly force is objectively reasonable when an officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Thomas*, 854 F.3d at 365 (citing *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). The focus of this consideration is an "objective assessment of the danger a suspect poses at [the] moment" directly preceding the shooting. *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).

Under the circumstances presented here, an officer is not justified in using deadly force to stop a suspect from merely resisting arrest or fleeing from police. *Id.* at 891. The crux of this case is whether Officer Hampton reasonably believed that Matthews posed an immediate danger to his safety, thus justifying the use of deadly force. Hampton testified that Matthews had his hand on his gun, which was loose in his holster. Accepting Hampton's version of events, Matthews posed an immediate danger to the officer's safety. *See, e.g., Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009) (deadly force not unreasonable when suspect advanced on officers with a knife); *Burnette v. Gee*, 137 Fed. Appx. 806, 808-10 (6th Cir. 2005) (officer reasonably feared for his life when suspect reached for a rifle and resisted attempts to disarm him); *DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418, 421 (6th Cir. 2006) (shooting not excessive force when suspect

stepped toward officers while aiming a gun at them); *Steele v. City of Cleveland*, 375 Fed. Appx. 536, 542 (6th Cir. 2010) (officer and suspect struggled for control of a gun).

Plaintiff argues, however, that Hampton's version of events is not credible, for several reasons. Plaintiff argues that the size discrepancy between the two men, Matthews's recently fractured arm, and Matthews's desire to flee casts doubt on Hampton's story that Matthews was able to "overtake" him, stand over him, and reach for his gun with his right (non-dominant) hand.

Plaintiff also contends that the physical evidence does not support Hampton's story. Plaintiff raises a number of alleged discrepancies (*see* Doc. 91 at 15-16, 23-24, 26, 30-31), the most compelling of which are discussed here.

Plaintiff notes that although Matthews allegedly grabbed Hampton's pepper spray, ammunition magazine, and gun, his fingerprints were not found on any of these items. The weight of this evidence is somewhat diminished, however, by the lack of *any* prints recovered, even Hampton's. Doc. 104-2.

Plaintiff also argues that it is unlikely that Hampton's gun was "loose" in its holster, as Hampton claims. Hampton carried a double-locked holster, which requires the officer to depress two safety mechanisms to release the

gun. First, the officer presses his thumb down to release the hood. With the hood released, the gun remains locked in place until the officer depresses the second lock with his forefinger. Only then is the officer able to pull the gun out of the holster. Hampton provided no explanation for how his gun became loose, but stated that he did not release the safety mechanisms. Given these safety mechanisms, which were functional at the time, it seems doubtful that the gun became loose on its own or that Matthews was able to release it. *See* Doc. 91-20 (video demonstration of double-locked holster).

Plaintiff has provided the opinions of two experts, David Balash and Jeremy Cummings, who state that the shooting could not have occurred in the manner Hampton claimed.[2] Cummings conducted a biomechanical analysis of the incident, including an analysis of the bullet trajectories through Matthews's body. *See* Doc. 91-15. Cummings noted that two bullets were found under Matthews's body and one was found next to his body after the shooting. He opined in his report that it "is highly unlikely for three bullets that pass through Kevin Matthews' body with an upwards trajectory ... to end up next to his body." *Id.* at 5. He further noted that Matthews did not fall on Hampton after the shooting and that none of Matthews's blood was found on

---

[2] Defendant moved to exclude the testimony of these experts; Magistrate Judge Stephanie Dawkins Davis denied the motions on April 19, 2019. *See* Doc. 122.

Hampton's clothing. *Id.* Cummings concluded that the "physical evidence in this case places Officer Hampton shooting downwards over Kevin Matthews and this positioning is inconsistent with Mr. Matthews reaching for Officer Hampton's gun." *Id.*

David Balash, a forensic firearms examiner and crime scene reconstructionist, also opined that Hampton was standing over Matthews when he shot him, not the other way around as claimed by Hampton. *See* Doc. 91-17. Balash states that the "angle of the shots and the passage of the bullets through Mr. Matthews [sic] body indicate that he would have been lying on his back or left side with Officer Hampton either lying behind/on top of him on the ground or over him firing in a downward direction which would account for the two bullets recovered under Mr. Matthews and the one on the ground near the back of the victim." *Id.* at 8. Balash further queried: "If the bullets were fired in an upward direction as stated by Officer Hampton, how is it that three (3) fired bullets are found underneath/near the victim?" *Id.*

The opinions of these experts, based upon the physical evidence, is sufficient to cast doubt on Hampton's claim that Matthews was standing over him and trying to get his gun when the shooting occurred. Thus, Plaintiff has raised a genuine issue of material fact regarding the circumstances surrounding the shooting and Officer Hampton's credibility, which must be

resolved by the trier of fact. In light of this, granting qualified immunity to Officer Hampton on summary judgment would be inappropriate. *See Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) (summary judgment improper when the "legal question of immunity is completely dependent upon which view of the facts is accepted by the jury").

### B. Clearly Established Right

Viewing the facts in the light most favorable to Plaintiff, Officer Hampton deployed deadly force when Matthews was attempting to flee and did not reasonably believe that Matthews was a significant threat to his safety. The right to be free of excessive force in such a situation is clearly established. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). Defendant's argument to the contrary is premised on an acceptance of Officer Hampton's version of events, about which there is a question of fact.

### III. State Law Claim

Defendant also seeks summary judgment on Plaintiff's claim under Michigan's Wrongful Death Act, M.C.L. 600.2922. The Wrongful Death Act does not create a substantive cause of action, but provides for damages in the event of a death caused by the "wrongful act, neglect, or fault of another." *Id. See also Wesche v. Mecosta Cty. Rd. Comm'n,* 480 Mich. 75, 88, 746

N.W.2d 847, 856 (2008) ("[T]he wrongful-death act is essentially a 'filter' through which the underlying claim may proceed."); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590 (6th Cir. 2006) (applying Michigan's Wrongful Death Act to govern claim for damages under § 1983). Defendant contends that, because Plaintiff's underlying § 1983 claim is not viable, the wrongful death claim should likewise be dismissed. As discussed above, the court finds that Plaintiff's § 1983 claim should proceed to trial and, therefore, Defendant has not established a basis for the dismissal of Plaintiff's claim for damages under the Wrongful Death Act.[3]

In addition, Defendant seeks summary judgment "to the extent that Plaintiff seeks to recover for emotional distress, loss of a loved one, or any other collateral injury allegedly suffered personally by a member of Mr. Matthews' family." Doc. 76 at 36. It does not appear from the complaint that Plaintiff is seeking to recover damages for injuries suffered by Matthews's family members. *See* Doc. 19 at ¶ 85. Plaintiff has not responded to Defendant's argument, suggesting either that she is not seeking these damages or that she has abandoned any such claim. As such, it does not appear that there is an issue for the court to resolve.

---

[3] At the hearing, Plaintiff suggested for the first time that the amended complaint raises a state claim for battery. No such claim is pleaded in the complaint. *See* Doc.19 at ¶¶82, 85.

## CONCLUSION

IT IS HEREBY ORDERED that Defendant's motion for summary judgment (Doc. 76) is DENIED.

Dated: April 29, 2019

                                            s/George Caram Steeh
                                            GEORGE CARAM STEEH
                                            UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on April 29, 2019, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk